## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
)
UNITED STATES SECURITIES AND                     )
EXCHANGE COMMISSION,                             )
                                                 )
                          Plaintiff,             )    Civil Action No. 24-cv-1727
                                                 )
        v.                                       )
                                                 )    JURY TRIAL DEMANDED
DONNA DELLOMO, YOON UM, AND                      )
THE LOVESAC COMPANY,                             )
                                                 )
                          Defendants.            )
_____ )

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission (the "Commission" or

"SEC"), for its complaint against Defendants, Donna Dellomo ("Dellomo"), Yoon Um ("Um"),

and The Lovesac Company ("Lovesac" or "the Company"), hereby alleges as follows:

## SUMMARY

1.      This case involves fraudulent accounting treatment of approximately $2.2 million

in shipping expenses that led to materially misleading financial statements being filed with the

Commission and made available to the investing public.  Furniture retailer and publicly traded

company (sometimes referred to as an "issuer" of securities) Lovesac, its former Chief Financial

Officer ("CFO") and Executive Vice President, Donna Dellomo, and its former Controller and

Vice President, Yoon Um, failed to properly account for "last mile" shipping expenses, *i.e.*, the

cost of shipping finished products from Lovesac's distribution centers to its customers.  Dellomo

and Um instead engaged in a fraudulent scheme to obscure the expenses in the company's books

and records.

2.      In April 2023, Lovesac discovered that $2.2 million in last mile shipping expenses

were not properly recorded and reported in its previously published financial results for the periods in which they were incurred.  The $2.2 million in last mile shipping expenses had instead been inaccurately recorded in the Company's books and records for the first quarter of fiscal year 2024.  Um, in concert with Dellomo, engaged in a scheme to hide those expenses from investors and the Commission.  They did this to avoid missing Lovesac's projected gross margin—an important financial metric that the Company disclosed in its SEC filings and on conference calls that are open to investors where the Company discusses financial and other issues (often referred to as "earnings calls," which are frequently attended by financial analysts covering the Company)—and to avoid restating the Company's prior financial filings for the periods in which the expenses were incurred.  To accomplish this scheme, Dellomo and Um improperly accounted for the expenses.  Dellomo and Um, both experienced financial professionals and certified public accountants ("CPA"), knew, or were reckless in not knowing, that the fraudulent accounting treatment they devised was not compliant with generally accepted accounting principles in the United States ("GAAP") and rendered certain of Lovesac's financial statements materially false and misleading.

3.      As part of the scheme, Dellomo also submitted a false and misleading management representation letter to Lovesac's outside auditor and otherwise failed to alert Lovesac's auditors to the fraudulent accounting for the $2.2 million in last mile shipping expenses.  Further, Lovesac and Dellomo failed to implement sufficient internal controls over financial reporting—that is, processes, policies and procedures put in place by a company to provide reasonable assurances as to the accuracy, reliability, and integrity of its financial reporting—that may have prevented or detected Dellomo and Um's fraudulent accounting.  In the end, Lovesac was required to restate its financial statements for fiscal year 2023 and the first

quarter of fiscal year 2024 to correct Dellomo and Um's fraud.

4.      As a result of the conduct alleged herein, Lovesac violated Section 17(a)(3) of the Securities Act of 1933 ("Securities Act"), Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.  Dellomo violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, Sections 10(b) and 13(b)(5) of the Exchange Act, and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2, thereunder.  Dellomo also aided and abetted Lovesac's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder. Um violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, and Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c) and 13b2-1 thereunder.  Um also aided and abetted Dellomo's violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder and Lovesac's violations of Exchange Act Sections 13(a), and 13(b)(2)(A), and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

5.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

6.      The Commission seeks permanent injunctions against Defendants, enjoining them from engaging in the unlawful conduct alleged in this Complaint, and civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  The Commission further seeks an order prohibiting Dellomo and Um from acting as officers or directors of any public company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], an order barring Dellomo and Um from practicing as

accountants before the Commission, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa].

8.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, and transactions and courses of business alleged in this Complaint occurred within the District of Connecticut and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.

## DEFENDANTS

9.      **Lovesac,** a furniture retailer, is a Delaware corporation with its principal place of business in Stamford, Connecticut.  Lovesac became a public company through an initial public offering in 2018.  The Company's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on Nasdaq under the symbol "LOVE."  Lovesac files periodic reports with the Commission on Forms 10-K (annual financial statements), 8-K (current reports), and 10-Q (quarterly financial statements), among others.  During the relevant period, Lovesac issued stock compensation to employees pursuant to a stock incentive plan for which a Form S-8 registration statement was filed with the Commission on July 8, 2022.  Further, on June 26, 2023, Lovesac issued shares pursuant to the exercise of certain stock warrants.

10.      **Donna Dellomo,** age 60, is a resident of Williamsburg, Virginia.  Dellomo has been licensed as a CPA since 1991 and is currently licensed in New York.  Between January 2017 and June 2023, Dellomo served as Lovesac's Chief Financial Officer and Executive Vice

President and oversaw finance, accounting, administration and risk management, and legal departments at the Company.  She retired from Lovesac in June 2023.  After retiring, Dellomo worked as a strategic consultant for Lovesac for a year through June 2024.

11.    **Yoon Um,** age 41, is a resident of Athens, New York.  Um has been licensed as a CPA since 2009 and is currently licensed in New York.  She was employed as Lovesac's Controller and Vice President starting in November 2022 and agreed to resign in July 2023. Prior to serving as Lovesac's Controller, Um was a Controller at another public company for two years and spent almost a decade in various auditing roles at a large public accounting firm before that.

## FACTS

**Lovesac's Business**

12.    Lovesac is a furniture company that designs, manufactures, and sells furniture comprised of modular couches called Sactionals and foam beanbag chairs called Sacs, as well as accessories.  The Company markets its products primarily through its website and showrooms at malls throughout the United States.  The Company operates through a direct-to-consumer model selling its products online and shipping directly to customers.

13.    The Company went public on June 26, 2018, with an initial offering priced at $16.00 per share.  The Company's common stock trades on Nasdaq under the Symbol "LOVE."

**Lovesac's Finance and Accounting Group**

14.    At all relevant times, Lovesac's finance and accounting group was led by the Chief Financial Officer and Executive Vice President, Donna Dellomo.  Dellomo, an experienced financial professional and CPA, began her career as an auditor at various

companies, and subsequently served as an accounting manager, corporate Controller, and CFO of another public company.

15.    Beginning in 2017, Dellomo served as Lovesac's CFO, initially working to help prepare the Company for its initial public offering in 2018.  During the relevant period, Dellomo's direct reports included Um (the Company's Controller), who was hired in November 2022 and oversaw the Company's accounting functions.  During her ten months as Lovesac's Controller, Um and her reports were responsible for internal accounting functions.  Um agreed to resign in July 2023 and left the Company in September 2023.

**Glossary of Relevant Accounting Terminology**

16.    *Fiscal Year*:  A public company's fiscal year ("FY") is the twelve-month period in which a company reports quarterly and annual financial results.  Lovesac operates on a 52- or 53-week fiscal year that ends on the Sunday closest to February 1st.  The Company reports financial results on this schedule to account for increased sales during the November to January holiday season.  FY 2023 was 52 weeks and ended on January 29, 2023, and FY 2024 was 53 weeks and ended on February 4, 2024.  A public company's annual financial results based on the fiscal year are publicly reported on SEC Form 10-K ("Form 10-K") filed with the Commission, as required by law.

17.    *Fiscal Quarter*:  Public companies also report quarterly results for the four three-month quarters in each fiscal year.  Lovesac's FY 2023 quarters consisted of the first quarter (or "Q1") (February through April), the second quarter (or "Q2") (May through July), the third quarter (or "Q3") (August through October), and the fourth quarter (or "Q4") (November through January).  Quarterly financial results are often publicly reported in a SEC Form 8-K ("Form 8-K") filed with the Commission and, for the first three quarters of the year, additionally

reported on SEC Form 10-Q ("Form 10-Q") filed with the Commission, as required by law.  Q4 results are incorporated into the annual Form 10-K.

18.    *GAAP*:  GAAP (Generally Accepted Accounting Principles in the United States) refers to the standard framework of guidelines for accounting used in the United States as established by the Financial Accounting Standards Board.  These principles set the rules for preparing, presenting, and reporting financial statements of public companies, ensuring consistency, and transparency.  GAAP is used by accountants, auditors, and the investing public to compare financial information across different organizations, maintaining uniformity in financial reporting.  Required financial statements, such as Form 10-Q and Form 10-K, must be prepared in accordance with GAAP.  If such financial statements are not prepared in accordance with GAAP, they are presumed to be misleading or inaccurate.

19.    *Accrual*:  An "accrual" reflects revenue earned or expenses incurred before the actual cash transaction has taken place.  An accrual for a shipping expense would reflect a shipping expense incurred (*i.e.*, when a product has been shipped to the customer) but that has not yet been paid by the company.

20.    *Gross margin*:  Gross margin is a financial metric that represents the difference between net sales (net sales refers to the sale of merchandise plus shipping and handling revenue less returns and discounts) and cost of merchandise sold and is expressed as a percentage of net sales.  A higher gross margin indicates that a company is retaining more of its revenue after covering the direct costs associated with producing goods.  For example, if a company sold ten widgets for $100 each and all the direct costs were $40 per widget, the gross margin would be 60%, meaning that the company retained $600 or 60% of the net sales.

21.    *Capitalization*:  Capitalization is an accounting concept that refers to the process of recording an expenditure as an asset rather than an expense.  When an expense is capitalized, the underlying expense is spread out over the useful life of the asset instead of the full cost being recorded in the company's books and records and reported in its financial statements (sometimes referred to as revenue being "recognized").  Capitalization is applied to expenditures that provide future economic benefits under certain circumstances.  For example, a company may capitalize the cost of manufacturing machinery that will allow the company to manufacture products over time.  Through capitalizing such costs, companies match the cost of an asset with the revenue that it generates over time.  This contrasts with expenses that do not provide a future economic benefit, such as outbound shipping costs, that are recorded in the period in which the expenses were incurred and the revenue recognized.

22.    *Amortization*:  Amortization refers to the financial concept of allocating the cost of an intangible asset over its useful life.  This process records the cost of the asset over the period it is expected to generate economic benefits.  Thus, for example, a company might divide the cost of an intangible asset, such as a patent, over the useful life of the patent.  In this example, if the patent was expected to generate revenue from sales of a patented invention for ten years, the cost of the patent would be spread out over the same ten-year period.

23.    *General Ledger*:  The general ledger is a record of a company's financial transactions, where all journal entries are recorded.  A journal entry is the initial record of each of the company's transactions, detailing the date, accounts affected, amounts, and a brief description.  These journal entries are "posted" to the general ledger, which organizes them by account (such as assets, liabilities, equity, revenue, and expenses) and serves as the foundation for preparing a company's financial statements, such as the balance sheet and income statement.

**Last Mile Shipping**

24.     "Last mile shipping" is the term used by Lovesac to reflect the cost of transporting Lovesac's finished products from a distribution center to the customer.  At all relevant times, Lovesac used large shipping companies like FedEx for its last mile shipping.

25.     With respect to last mile shipping expenses, Lovesac publicly disclosed in its FY 2023 Form 10-K that it "records the expenses for shipping and handling activities at the same time the Company recognizes revenue.  Shipping and handling costs incurred are included in cost of merchandise sold and include inbound freight and tariff costs relative to inventory sold, warehousing, and last mile shipping to our customers."  As set forth below, Lovesac's accounting for last mile shipping expenses was inconsistent with this public disclosure, as was Dellomo and Um's scheme to hide last mile shipping expenses.

26.     On average, there was at least a two-week delay between the shipping date (the date when a product was shipped by FedEx) and the invoice date (the date when the FedEx invoice was received by Lovesac).  Lovesac accounted for this timing discrepancy through an accrual process whereby the Company calculated and recorded a monthly estimate of shipping expenses incurred, but not yet recorded in its books and records.  The accrual was later reconciled against actual amounts paid to shipping companies based on invoices.

27.     However, during the relevant period, Lovesac's monthly accrual methodology was flawed and inconsistently applied.  In certain circumstances, relevant shipment data for the period was not used in the shipping container count estimate and improper assumptions were used for the cost per shipment calculation.  As a result, the estimated accrual was understated, which was not compliant with GAAP because the expenses incurred in the period were not properly recorded.

**Dellomo and Um Devised a Scheme to Obscure the Last Mile Shipping
Expenses in Lovesac's Q1 2024 Books**

28.    While performing an analysis in April 2023 as part of Lovesac's monthly
financial closing process, Lovesac's finance and accounting group employees discovered that
last mile shipping expenses were significantly higher in Q1 2024 than what the Company had
previously budgeted for the month.  Specifically, Lovesac's finance and accounting group
employees estimated that approximately $2.2 million of last mile shipping expenses were
improperly recorded in Q1 2024 rather than having been recorded in FY 2023, the period in
which they believed the expenses were actually incurred.

29.    On Sunday, April 23, 2023, Dellomo, in an email to employees including
members of the finance and accounting group, indicated that the out-of-period shipping expenses
would cause Lovesac's gross margin for Q1 2024 to be lower than expected.  As explained
above, gross margin is a financial metric, and a higher gross margin figure is more positive for a
company.  In the same email, Dellomo expressed concern about not meeting Lovesac's 50.1%
gross margin projection, which had been publicly disclosed by Lovesac during a March 28, 2023
earnings call.  Minutes later, Dellomo forwarded her email to Um and requested that she
investigate the issue.

30.    The next day, Monday, April 24, 2023, members of Lovesac's finance and
accounting group met to discuss the problem with last mile shipping expenses having been
improperly recorded in Q1 2024.  On April 25, 2023, Dellomo emailed Um and the same group,
noting that the gross margin estimate for Q1 2024 was, as of that day, only 48.7%.  This was 140
basis points lower than Lovesac's Q1 2024 gross margin projection of 50.1%, which, as noted
above, was publicly disclosed to investors during the March 28, 2023 earnings call.

31.     On or about Tuesday, April 25, 2023, Um and other members of Lovesac's finance and accounting group concluded that there were approximately $2.2 million of last mile shipping invoices for shipping expenses incurred in FY 2023 that were not recorded until Q1 2024.

32.     On the same day, members of the finance and accounting group, including Dellomo and Um, discussed the $2.2 million out-of-period expenses and the impact on Lovesac's gross margin for Q1 2024.  Um stated in a Microsoft Teams chat that she could not justify, as an accounting matter, reversing the $2.2 million shipping expenses.  Another finance and accounting group employee who reported to Um communicated to her that reversing the $2.2 million from the Q1 2024 books would be "a giant black eye for the auditors to pick out."

33.     Also on April 25, Um communicated with a senior member of Lovesac's financial planning and analysis ("FP&A") group.  Um told that individual, in a Microsoft Teams chat, that the only way to meet the Q1 2024 gross margin projection was to capitalize the $2.2 million last mile shipping expenses and amortize them evenly over the remaining three quarters of FY 2024 starting in Q2 2024.  Um replied: "I just don't know how I can support [it]."  Indeed, capitalizing the $2.2 million in shipping expenses would not comply with GAAP because the expenses did not provide any future economic benefit.

34.     The following day, on April 26, 2023, in a Microsoft Teams chat with the same senior member of the FP&A group, Um stated that the Company was going to miss its publicly disclosed gross margin projection for Q1 2024 unless the $2.2 million in last mile shipping expenses were removed from Lovesac's Q1 2024 financial results.  Um additionally expressed concern over being fired from Lovesac because of the last mile shipping issue.  Around the same

time, in a Microsoft Teams chat with another finance and accounting group employee, Um expressed further concern over her job security.

35.     Also on April 26, 2023, Um and Dellomo again discussed the $2.2 million out-of-period expenses during a call and, working in concert, decided to remove the expenses from Lovesac's Q1 2024 financial results.  Their solution was to capitalize the expenses in the Company's general ledger and then amortize the total over the last three quarters of FY 2024 starting in Q2 2024.  This was the same proposed accounting treatment that Um had indicated she could not justify the day before.  This accounting treatment would have two consequences: first, it would improperly avoid the cost, time, and negative reflection on the Company associated with reopening and restating the FY 2023 books to properly account for the expenses in the period they were actually incurred and, second, it would improperly allow the Company to meet its previously disclosed Q1 2024 gross margin projection.

36.     After talking to Dellomo on April 26, Um again communicated with a senior member of Lovesac's FP&A group to ask if the proposed accounting treatment would result in the Q1 2024 gross margin being the same as the publicly disclosed projection of 50.1%.

37.     On April 26, 2023, after consulting Dellomo on the details of the entry, Um improperly booked a journal entry in the Company's general ledger to capitalize the $2.2 million expenses as an asset with the plan to spread out the expenses over the last three quarters of FY 2024.  Dellomo approved Um's journal entry in Lovesac's accounting system the following day, April 27, 2023.  As a result of this improper journal entry, the Company's expenses in Q1 2024 were decreased by $2.2 million, which had the effect of meeting the Q1 2024 gross margin projection of 50.1%.  As noted above, this accounting treatment was not in compliance with GAAP and obscured the $2.2 million of out-of-period shipping expenses in the Company's 2024

books and records.  In effect, Dellomo and Um improperly pushed the last mile shipping

expenses into the future, even though they believed that they had been incurred in the prior fiscal

year.

 38. With respect to the journal entry, Um stated in a Microsoft Teams chat: "I don't

know how to tell [Dellomo] I don't feel comfortable with it[.]"  She nevertheless booked the

journal entry and stated that she hoped it would "do the trick" for Lovesac to meet its gross

margin target for Q1 2024.

 39. On June 7, 2023, as the result of the inappropriate accounting treatment for the

$2.2 million out-of-period last mile shipping expenses, Lovesac reported in a Form 8-K filed

with the Commission that its gross margin for Q1 2024 was 50.1%, exactly as the Company had

earlier publicly disclosed.  That same information was incorporated into Lovesac's Form 10-Q

for Q1 2024, filed with the Commission on June 9, 2023.

 40. With respect to journal entries, Dellomo, as Lovesac's CFO, typically required

detailed accounting support prior to approval.  Contrary to Dellomo's normal practice, no such

accounting support was attached to Um's journal entry.  In particular, at the time the $2.2 million

journal entry was made, Dellomo and Um did not perform a documented materiality analysis,

*i.e.*, a written analysis of whether the out-of-period last mile shipping expenses significantly

impacted Lovesac's FY 2023 financial results.  Nor was there any other supporting

documentation justifying the improper accounting treatment they devised.

 **Lovesac's Periodic Financial Reports Were Materially Misstated as a Result of
Dellomo and Um's Misconduct**

 41. As a result of Dellomo and Um's scheme, four of Lovesac's public financial

reports filed with the Commission were rendered materially false and misleading.

42.     *Lovesac's FY 2023 Form 10-K*.  Lovesac's Form 10-K for FY 2023, filed with the Commission on March 29, 2023, was materially false and misleading because last mile shipping expenses were not included in the period in which they were actually incurred and the Form 10-K did not disclose material weaknesses in Lovesac's internal accounting controls environment, including that management did not sufficiently implement, promote, monitor, or enforce appropriate accounting policies and procedures.

43.     *Form 8-K Filed March 28, 2023*.  A Form 8-K announcing Lovesac's FY 2023 financial results, filed with the Commission on March 28, 2023, was materially false and the Form 10-K misleading because last mile shipping expenses were not included in the period in which they were incurred and did not disclose material weaknesses in Lovesac's internal accounting control environment including that management did not sufficiently implement, promote, monitor, or enforce appropriate accounting policies and procedures.

44.     *Lovesac's Q1 2024 Form 10-Q*.  Lovesac's Form 10-Q for Q1 2024, filed with the Commission on June 9, 2023, omitted financial and other information required to make the report not misleading because the report:

    a.   did not disclose the existence of out-of-period last mile shipping expenses;

    b.   did not disclose that the Company's financial statements improperly reported the last mile shipping expenses as an asset;

    c.    did not disclose Dellomo and Um's fraudulent $2.2 million journal entry removing those expenses from Lovesac's Q1 2024 results;

    d.   did not disclose that the gross margin figure of 50.1% in Lovesac's Form 10-Q for Q1 2024 was manipulated by Dellomo and Um's misconduct in removing last mile shipping expenses from the quarter;

e.  did not disclose that financial statements included in Lovesac's Form 10-Q were not prepared in accordance with GAAP; and

f.  did not disclose material weaknesses in the control environment including that management did not sufficiently implement, promote, monitor, or enforce appropriate accounting policies and procedures.

45.    *Form 8-K filed June 7, 2023*.  A Form 8-K announcing Lovesac's financial results for Q1 2024, which was filed with the Commission on June 7, 2023, omitted financial and other information required to make the report not misleading because the report:

a.  did not disclose the existence of out-of-period last mile shipping expenses;

b.  did not disclose that the Company's financial statements improperly reported the last mile shipping expenses as an asset;

c.  did not disclose Dellomo and Um's fraudulent $2.2 million journal entry removing those expenses from Lovesac's Q1 2024 results;

d.  did not disclose that the financial results announced in Lovesac's Form 8-K were not prepared in accordance with GAAP; and

e.  did not disclose material weaknesses in the control environment including that management did not sufficiently implement, promote, monitor, or enforce appropriate accounting policies and procedures.

46.    By knowingly making a fraudulent journal entry that was not compliant with GAAP and had the effect of obscuring the $2.2 million in last mile shipping expenses in the Company's FY 2024 books and records, Um engaged in fraudulent conduct that rendered the above filings false and misleading.  By knowingly approving Um's improper April 27, 2023 journal entry that capitalized the $2.2 million in last mile shipping expenses, Dellomo engaged in

fraudulent conduct that rendered the above filings false and misleading. Dellomo also had ultimate authority over Lovesac's public filings and falsely certified Lovesac's Form 10-Q for Q1 2024 while knowing that it was materially false and misleading. Um made the inappropriate journal entry that she knew, or was reckless in not knowing, would render Lovesac's Q1 2024 financial filings false and misleading.

47.     Public companies like Lovesac are further required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of their assets. Lovesac's books and records did not accurately and fairly reflect the $2.2 million in last mile shipping expenses. Dellomo and Um's conduct rendered Lovesac's books and records inaccurate by obscuring the $2.2 million in last mile shipping expenses.

**Dellomo Falsely Certified Lovesac's Q1 2024 Form 10-Q**

48.     Periodic financial reports filed with the Commission must also include a certification signed by the issuer's principal financial officer (here, Dellomo) that, based on the certifier's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition, results of operations, and cash flows of the issuer as of, and for, the periods presented in the report, that the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report. Dellomo falsely certified Lovesac's Form 10-Q for Q1 2024 while knowing that the filing omitted information necessary to make the filing not false and misleading. Specifically, among other things, Dellomo's certification falsely stated that: (a) Lovesac designed "internal controls over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP];" (b) the financial statements, and

other financial information included in the Company's filings, fairly presented in all material

respects the financial condition of the Company; and (c) Dellomo disclosed to the Company's

audit committee and outside auditor "[a]ll significant deficiencies and material weaknesses in the

design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not

material, that involves management or other employees who have a significant role in the

registrant's internal control over financial reporting."

### Dellomo Misled Lovesac's Outside Auditor about Their Misleading Accounting Treatment of the Last Mile Shipping Expenses

49.     Dellomo did not inform Lovesac's outside auditor, a large public accounting firm,

of the $2.2 million in out-of-period last mile shipping expenses inappropriately recorded in Q1

2024 and the subsequent journal entry that removed the expenses from Q1 2024, which was not

compliant with GAAP.  Dellomo did not disclose or discuss the issue with the outside auditor's

personnel responsible for auditing Lovesac's books and records even though she had an

obligation to do so.  Dellomo also made false and misleading representations to Lovesac's

outside auditor in the management representation letter she signed and submitted to the outside

auditor as part of its Q1 2024 review.  The management representation letter was misleading

because it falsely represented that:

Item 1.  The interim financial information referred to above has been prepared and presented in conformity with GAAP applicable to interim financial information.

Item 2.  The Company has provided to you all relevant information and access as agreed in the terms of the audit engagement letter.

Item 11.  The methods, significant assumptions, and the data used by us in making the accounting estimates and the related disclosures are appropriate to achieve recognition, measurement, or disclosure that is in conformity with GAAP.

Item 22.  There are no transactions that have not been properly recorded and reflected in the interim financial information.

Item 36.  We believe that all expenditures that have been deferred to future periods are recoverable.

50.    Further, Dellomo was asked by Lovesac's outside auditor's personnel whether there were any unusual transactions or entries in the Company's books and records that were not GAAP compliant.  Dellomo failed to inform the outside auditor of the $2.2 million out-of-period last mile shipping expenses and the journal entry capitalizing those expenses.  Had the auditor been informed, it would have instructed Lovesac to perform an appropriate and documented materiality assessment and would have reviewed the Dellomo and Um's decision to capitalize those expenses for compliance with GAAP.

**Lovesac and Dellomo Failed to Devise and Maintain Sufficient Internal Accounting Controls Over Financial Reporting**

51.    Lovesac was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the assets.  Lovesac was also required to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its financial statements are prepared in conformity with GAAP or any other criteria applicable to those statements.

52.    During the relevant period, Lovesac did not maintain a system of internal accounting controls sufficient to provide reasonable assurances that shipping expenses incurred, but not yet recorded, were properly accrued for and that journal entries were properly booked, which caused the Company to restate its SEC filings.

53.    Dellomo knowingly failed to implement an appropriate system of internal accounting controls.  Dellomo, as the CFO, was responsible for Lovesac's internal control structure, and was aware of the issues underlying Lovesac's internal control failures.  Additionally, Dellomo engaged in the misconduct of approving Um's journal entry capitalizing

the $2.2 million out-of-period last mile shipping expenses that she knew, or was reckless in not knowing, was not compliant with GAAP.

**Lovesac Restates Its FY 2023 and Q1 2024 SEC Filings**

54.    On June 13, 2023, an employee of Lovesac reported the April 26, 2023 journal entry to Lovesac's outside auditor.  This report triggered an internal investigation.  On August 16, 2023, Lovesac filed a Form 8-K with the Commission announcing that its previously filed financial statements for FY 2023 and Q1 2024—as well as any previously issued or filed earnings releases, investor presentations, or other communications describing the prior financial statements and other related financial information covering these periods—could no longer be relied upon.  Lovesac restated its financials for FY 2023 and the Q1 2024 to correct for the last mile shipping expenses Dellomo and Um had improperly recorded in a manner that was not compliant with GAAP to avoid restating Lovesac's FY 2023 SEC filings and to avoid missing the Company's gross margin projection for Q1 2024.

## FIRST CLAIM

**FRAUD IN THE OFFER OR SALE OF SECURITIES AGAINST DELLOMO AND UM**

**(Violations of Securities Act Sections 17(a)(1) and (3))**

55.    Paragraphs 1 through 54 are re-alleged and incorporated by reference.

56.    By reason of the conduct described above, Dellomo and Um, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acted knowingly or recklessly in violation of Securities Act Section 17(a)(1) by employing devices, schemes, or artifices to defraud and/or acted knowingly, recklessly, or negligently in violation of Securities Act Section 17(a)(3) by engaging in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

57.     As a result, Dellomo and Um violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM

### FRAUD IN THE OFFER OR SALE OF SECURITIES AGAINST LOVESAC

### (Violations of Securities Act Section 17(a)(3))

58.     Paragraphs 1 through 57 are re-alleged and incorporated by reference.

59.     By reason of the conduct described above, Lovesac, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acted negligently in violation of Securities Act Section 17(a)(3) by engaging in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

60.     As a result, Lovesac violated Securities Act Section 17(a)(3) [15 U.S.C. § 77q(a)(3)].

## THIRD CLAIM

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES AGAINST DELLOMO AND UM

### (Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder)

61.     Paragraphs 1 through 60 are re-alleged and incorporated by reference.

62.     By reason of the conduct described above, Dellomo and Um, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly employed devices, schemes, or artifices to defraud and/or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

63.     As a result, Dellomo and Um violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

## FOURTH CLAIM

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES AGAINST DELLOMO

**(Violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder)**

64.     Paragraphs 1 through 63 are re-alleged and incorporated by reference.

65.     By reason of the conduct described above, Dellomo, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     As a result, Dellomo violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## FIFTH CLAIM

### AIDING AND ABETTING DELLOMO'S VIOLATIONS OF EXCHANGE ACT SECTION 10(b) AND RULE 10b-5(b) THEREUNDER AGAINST UM

**(Aiding and abetting Dellomo's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder)**

67.     Paragraphs 1 through 66 are re-alleged and incorporated by reference.

68.     By reason of the conduct described above, Dellomo, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly made one or more untrue statements of a material fact or omitted to state one or more

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     As a result, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Um knowingly or recklessly provided substantial assistance to Dellomo in her violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SIXTH CLAIM

### KNOWINGLY CIRCUMVENTING INTERNAL CONTROLS, FAILING TO IMPLEMENT INTERNAL CONTROLS, OR FALSIFYING BOOKS AND RECORDS AGAINST DELLOMO

### (Violations of Exchange Act Section 13(b)(5))

70.     Paragraphs 1 through 69 are re-alleged and incorporated by reference.

71.     By reason of the conduct described above, Dellomo knowingly circumvented and/or knowingly failed to implement a system of internal accounting controls and/or knowingly falsified, or caused to be falsified, Lovesac's books and records.

72.     As a result, Dellomo violated Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)].

## SEVENTH CLAIM

### FALSIFYING ANY BOOK, RECORD, OR ACCOUNT AGAINST DELLOMO AND UM

### (Violations of Exchange Act Rule 13b2-1)

73.     Paragraphs 1 through 72 are re-alleged and incorporated by reference.

74.     By reason of the conduct described above, Dellomo and Um, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 13(b)(2)(A)].

75.     As a result, Dellomo and Um violated Exchange Act Rule 13b2-1 [17 C.F.R §

240.13b2-1].

## EIGHTH CLAIM

### LYING, COERCING, OR IMPROPERLY INFLUENCING AN ACCOUNTANT AGAINST DELLOMO

#### (Violations of Section Exchange Act Rule 13b2-2)

76.     Paragraphs 1 through 75 are re-alleged and incorporated by reference.

77.     By reason of the conduct described above, Dellomo omitted to state, or caused another person to omit to state, material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (1) any audit, review, or examination of the financial statements of the issuer; or (2) the preparation or filing of any document or report required to be filed with the Commission.

78.     As a result, Dellomo violated Exchange Act Rule 13b2-2 [17 C.F.R § 240.13b2-2].

## NINTH CLAIM

### MATERIAL MISSTATEMENTS OR OMISSIONS IN PERIODIC OR OTHER REPORTS AGAINST LOVESAC

#### (Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder)

79.     Paragraphs 1 through 78 are re-alleged and incorporated by reference.

80.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] require issuers of registered securities to file with the Commision materially accurate annual reports (on Form 10-K), current reports (on Form 8-K), and quarterly reports (on Form 10-Q).  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b20] provides that, in addition to the information expressly required

to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

81.    By reason of the conduct described above, Lovesac, as an issuer of a security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], filed (1) a Form 10-K for FY 2023 on March 29, 2023, (2) a Form 8-K for FY 2023 on March 28, 2023, (3) a Form 10-Q for Q1 2024 on June 9, 2023, and (4) a Form 8-K for Q1 2024 on June 7, 2023, that each contained materially false or misleading statements and/or material omissions that rendered the statements in these filings, in light of the circumstances under which they were made, misleading.

82.    As a result, Lovesac violated Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13] thereunder.

## <u>TENTH CLAIM</u>

### AIDING AND ABETTING LOVESAC'S MATERIAL MISSTATEMENTS OR OMISSIONS IN PERIODIC OR OTHER REPORTS AGAINST DELLOMO AND UM

**(Aiding and abetting Lovesac's violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder)**

83.    Paragraphs 1 through 82 are re-alleged and incorporated by reference.

84.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] require issuers of registered securities to file with the Commission materially accurate annual reports (on Form 10-K), current reports (on Form 8-K), and quarterly reports (on Form 10-Q).  Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b20] provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under

which they were made, not misleading.

85.    By reason of the conduct described above, Lovesac, as an issuer of a security registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], filed (1) a Form 10-K for FY 2023 on March 29, 2023, (2) a Form 8-K for FY 2023 on March 28, 2023, (3) a Form 10-Q for Q1 2024 on June 9, 2023, and (4) a Form 8-K for Q1 2024 on June 7, 2023, that each contained materially false or misleading statements and/or material omissions that rendered the statements in these filings, in light of the circumstances under which they were made, misleading.

86.    As a result, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Dellomo and Um knowingly or recklessly provided substantial assistance to Lovesac in its violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]

## ELEVENTH CLAIM

## FALSE CERTIFICATION OF FINANCIAL REPORTS AGAINST DELLOMO

### (Violations of Exchange Act Rule 13a-14)

87.    Paragraphs 1 through 86 are re-alleged and incorporated by reference.

88.    By reason of the conduct described above, Dellomo falsely certified, pursuant to Section 301 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14, Lovesac's Q1 2024 Form 10-Q.  Dellomo violated Rule 13a-14 when she signed certification for Lovesac's public filing that, among other things, failed to disclose the fraudulent accounting treatment of the last mile shipping expenses.

89.    As a result, Dellomo violated Exchange Act Rule 13a-14 [17 C.F.R. § 204.13a-14].

## TWELFTH CLAIM

### FAILURE TO MAKE AND KEEP BOOKS AND RECORDS IN REASONABLE DETAIL AGAINST LOVESAC

#### (Violations of Exchange Act Section 13(b)(2)(A))

90.     Paragraphs 1 through 89 are re-alleged and incorporated by reference.

91.     Exchange Act Section 13(b)(2)(A) requires an issuer such as Lovesac to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets.

92.     By failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets, Lovesac violated Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

## THIRTEENTH CLAIM

### AIDING AND ABETTING LOVESAC'S FAILURE TO MAKE AND KEEP BOOKS AND RECORDS IN REASONABLE DETAIL AGAINST DELLOMO AND UM

#### (Aiding and abetting Lovesac's violations of Exchange Act Section 13(b)(2)(A))

93.     Paragraphs 1 through 92 are re-alleged and incorporated by reference.

94.     By failing to make or keep books, records and accounts that in reasonable detail accurately and fairly reflected its transactions and disposition of its assets, Lovesac violated Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

95.     As a result, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], Dellomo and Um knowingly or recklessly provided substantial assistance to Lovesac in its violations of Exchange Act Section 13(b)(2)(A) [15 U.S.C. § 78m(b)(2)(A)].

## FOURTEENTH CLAIM

### FAILURE TO DEVISE AND MAINTAIN A SYSTEM OF INTERNAL ACCOUNTING CONTROLS AGAINST LOVESAC
### (Violations of Exchange Act Section 13(b)(2)(B))

96.     Paragraphs 1 through 95 are re-alleged and incorporated by reference.

97.     Exchange Act Section 13(b)(2)(B) requires an issuer such as Lovesac to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its financial statements are prepared in conformity with GAAP or any other criteria applicable to those statements.

98.     By failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its financial statements are prepared in conformity with GAAP or any other criteria applicable to those statements, Lovesac violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(A)].

## FIFTEENTH CLAIM

### AIDING AND ABETTING LOVESAC'S FAILURE TO DEVISE AND MAINTAIN A SYSTEM OF INTERNAL ACCOUNTING CONTROLS AGAINST DELLOMO

### (Aiding and abetting Lovesac's violations of Exchange Act Section 13(b)(2)(B))

99.     Paragraphs 1 through 98 are re-alleged and incorporated by reference.

100.    By failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its financial statements are prepared in conformity with GAAP or any other criteria applicable to those statements, Lovesac violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(A)].

101.    As a result, pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)], Dellomo and Um knowingly or recklessly provided substantial assistance to Lovesac in its violations of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Lovesac, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a)(3) of the Securities Act;

### II.

Permanently restraining and enjoining Lovesac, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder;

### III.

Permanently restraining and enjoining Dellomo, and those persons in active concert or participation with her who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1, 13b2-2 and 13a-14 thereunder;

### IV.

Permanently restraining and enjoining Dellomo, and those persons in active concert or participation with her who receive actual notice of the injunction by personal service or

otherwise, from aiding and abetting Lovesac's violations of 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder;

**V.**

Permanently restraining and enjoining Um, and those persons in active concert or participation with her who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act and Sections 10(b) of the Exchange Act and Rules 10b-5 and 13b2-1 thereunder;

**VI.**

Permanently restraining and enjoining Um, and those persons in active concert or participation with her who receive actual notice of the injunction by personal service or otherwise, from aiding and abetting Dellomo's violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder;

**VII.**

Permanently restraining and enjoining Um, and those persons in active concert or participation with her who receive actual notice of the injunction by personal service or otherwise, from aiding and abetting Lovesac's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13 thereunder;

**VIII.**

Enter an order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Dellomo and Um from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

## IX.

Enter an order pursuant to the Court's equitable power prohibiting Dellomo and Um from acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit.  For purposes of this requested relief, the following definitions apply: "Accounting or financial reporting role" means participating in the preparation of financial statements; decisions about financial reporting; the creation or implementation of accounting policies; or decisions about accounting treatment.  "Public company" means a company, foreign or domestic, that files financial statements with the Securities and Exchange Commission;

## X.

Ordering the Defendants to each pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## XI.

Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury trial in this matter.

DATED: October 29, 2024.

Respectfully submitted,

**UNITED STATES SECURITIES AND
EXCHANGE COMMISSION**

By its attorneys,

*/s/ Alfred A. Day*
Alfred A. Day (Mass. BBO No. 654436)
Xinyue Angela Lin (Mass. BBO No. 672786)
Martin F. Healey (Mass. BBO No. 227550)
Boston Regional Office
33 Arch Street, 24th Floor
Boston, Massachusetts  02110
(617) 573-8900 (Main)
(617) 573-4590 (Facsimile)
daya@ sec.gov (Day)
linxa@sec.gov (Lin)
healym@sec.gov (Healey)