## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, *Plaintiff*, <br><br> v. <br><br> DONNA DELLOMO, YOON UM, AND THE LOVESAC COMPANY, *Defendants*. | No. 3:24-cv-1727 (VAB) |

### RULING AND ORDER ON MOTIONS TO DISMISS AND MOTIONS TO STRIKE

The United States Securities and Exchange Commission ("Plaintiff" or "SEC") has filed a Complaint against Donna Dellomo, Yoon Um, and the Lovesac Company ("Lovesac").

The SEC alleges in Count One, fraud in the offer or sale of securities in violation of Sections 17(a)(1) and (3) of the Securities Act against Ms. Dellomo and Ms. Um (collectively, "Defendants"); in Count Three, fraud in connection with the purchase or sale of securities in violation of Section 10(b) of the Securities Act against Ms. Dellomo and Ms. Um; in Count Four, fraud in connection with the purchase or sale of securities in violation of Section 10(b) of the Securities Act against Ms. Dellomo; in Count Five, aiding and abetting Ms. Dellomo's alleged violation of Section 10(b) against Ms. Um; in Count Six, knowingly circumventing internal controls, failing to implement internal controls, or falsifying books and records in violation of Section 13(b)(5) of the Exchange Act against Ms. Dellomo; in Count Seven, falsifying any book, record, or account in violation of Section 13b2-1 of the Exchange Act against Ms. Dellomo and Ms. Um; in Count Eight, lying, coercing, or improperly influencing an accountant in violation of Section 13b2-2 of the Exchange Act against Ms. Dellomo; in Count Ten, aiding and abetting Lovesac's alleged material misstatements or omissions in periodic or other reports in violation of

Section 13(a) of the Exchange Act against Ms. Dellomo and Ms. Um; in Count Eleven, false

certification of financial reports in violation of Exchange Act Rule 13a-14 against Ms. Dellomo;

in Count Thirteen, aiding and abetting Lovesac's alleged failure to make and keep books and

records in reasonable detail in violation of Section 13(b)(2)(a) of the Exchange Act against Ms.

Dellomo and Ms. Um; and in Count Fifteen, aiding and abetting Lovesac's failure to devise and

maintain a system of internal accounting controls against Ms. Dellomo in violation of Section

13(b)(2)(B) of the Exchange Act.[1] Compl., ECF No. 1 (Oct. 29, 2024) ("Compl.").

Ms. Dellomo has filed a motion to strike and a motion to dismiss.

Ms. Um has filed a motion to dismiss and, alternatively, to strike certain relief.

The SEC opposes all motions.

For the following reasons, Ms. Dellomo's motion to dismiss is **GRANTED in part** and

**DENIED in part** and Ms. Um's motion to dismiss is **DENIED**. Count Fifteen will be dismissed,

and the motions to dismiss are denied as to all other Counts.

The motions to strike are **DENIED**, without prejudice to renewal.

To the extent deficiencies identified in this Ruling and Order can be remedied, the SEC

may file a motion for leave to amend the Complaint by **September 19, 2025**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Allegations

Lovesac is a furniture retailer selling couches and beanbag chairs. Compl. ¶¶ 9, 12.

---

[1] Since Judgment has been entered as to Lovesac, *see* Am. Consent J., ECF No. 46, and it is not the movant for any of the motions addressed in this Ruling and Order, the Court does not recount the claims alleged solely against Lovesac: Counts Two, Nine, Twelve, and Fourteen. Compl. ¶ 58–60, 79–82, 90–92; 96–98.

Ms. Dellomo, a certified public accountant, served as Lovesac's Chief Financial Officer and Executive Vice President from January of 2017 to June of 2023. From June of 2023 to June of 2024, Ms. Dellomo worked as a strategic consultant for Lovesac. *Id.* ¶ 10.

Ms. Um, a certified public accountant, served as Lovesac's controller and Vice President from November 2022 to July 2023. *Id.* ¶ 11.

There was allegedly "at least a two-week delay" regularly between the shipping date of an item of furniture from the distribution center to a customer and when the invoice was received by Lovesac from the shipping company. *Id.* ¶ 26. To account for this delay, Lovesac allegedly used "an accrual process whereby the Company calculated and recorded a monthly estimate of shipping expenses incurred, but not yet recorded in its books and records." *Id.* The accrual was allegedly reconciled later "against actual amounts paid to shipping companies based on invoices." *Id.*

In the relevant time period, Lovesac's method for accounting for this discrepancy was allegedly "flawed and inconsistently applied." *Id.* ¶ 27.

In April of 2023, Lovesac's finance and accounting group allegedly "discovered that last mile shipping expenses were significantly higher in Q1 2024[, the period from February, 2023, to April, 2023,] than what the Company had previously budgeted for the month." *Id.* ¶ 28. The finance and accounting group allegedly estimated that "approximately $2.2 million of last mile shipping expenses were improperly recorded in Q1 2024 rather than having been recorded in FY 2023." *Id.*

On April 23, 2023, Ms. Dellomo allegedly expressed concern in an e-mail forwarded to Ms. Um that the shipping expenses would "cause Lovesac's gross margin for Q1 2024 to be lower than expected." *Id.* ¶ 29.

On April 25, 2023, Ms. Um allegedly stated in a Microsoft Teams message "that she could not justify, as an accounting matter, reversing the $2.2 million shipping expenses." *Id.* ¶ 32. Another employee on the finance and accounting group allegedly said that "reversing the $2.2 million . . . would be 'a giant black eye for auditors to pick out.'" *Id.*

On the same day, Ms. Um allegedly told a senior member of Lovesac's financial planning and analysis group that "the only way to meet the Q1 2024 gross margin projection was to capitalize the $2.2 million last mile shipping expenses and amortize them evenly over the remaining three quarters of FY 2024." *Id.* ¶ 33.

On April 26, 2023, Ms. Um allegedly told the same senior member that Lovesac was not going to make its gross margin projection for Q1 2024, unless the shipping expenses were "removed from Lovesac's Q1 2024 financial results." *Id.* ¶ 34.

On the same day, Ms. Um and Ms. Dellomo allegedly decided to "remove" the expenses from the Q1 2024 results during a phone call. *Id.* ¶ 35. They allegedly decided to "capitalize the expenses in the Company's general ledger and then amortize the total over the last three quarters of FY 2024 starting in Q2 2024." *Id.* After speaking with Ms. Dellomo, Ms. Um allegedly asked a senior member of the financial planning and analysis group if the amortization proposal would result in Lovesac hitting the gross margin projection for Q1 2024. *Id.* ¶ 36.

Later that day, Ms. Um again spoke to Ms. Dellomo and allegedly made "a journal entry in the Company's ledger to capitalize the $2.2. million expenses as an asset with the plan to spread out the expenses over the last three quarters of FY 2024." *Id.* ¶ 37. This accounting allegedly did not comply with "General Accepted Accounting Principles" ("GAAP"), a standardized guidelines for accounting used in the United States, because "the expenses did not provide any future economic benefit." *Id.* ¶ 33.

On April 27, 2023, Ms. Dellomo allegedly approved Ms. Um's entry in the accounting system. *Id.* This entry allegedly had the effect of decreasing the Q1 2024 expenses by $2.2 million and then "push[ing] the last mile shipping expenses into the future." *Id.* In a Microsoft Teams message, Ms. Um allegedly stated, regarding the accounting entry, "I don't know how to tell [Ms. Dellomo] I don't feel comfortable with it." *Id.* ¶ 38.

On June 7, 2023, Lovesac allegedly reported to the SEC the Q1 2024 gross margin as it had initially expected, without accounting for the last mile shipping expenses. *Id.* ¶ 39. In total, Lovesac allegedly filed two "materially false and misleading" financial reports with the SEC, Form 10-Q and Form 8-K. *Id.* ¶¶ 44, 45. The accounting of the shipping expenses also allegedly rendered a previously filed Form 10-K and Form 8-K from FY 2023 to be misleading. *Id.*¶¶ 42, 43.

Ms. Dellomo allegedly did not inform Lovesac's outside auditor of the $2.2 million in shipping expenses. *Id.* ¶ 49. Additionally, she allegedly made "false and misleading representations" in the management representation letter submitted to the auditor for Q1 2024. *Id.*

On June 13, 2023, a Lovesac employee reported the journal entry regarding the shipping expenses to the outside auditor. *Id.* ¶ 54. As a result of this report, an investigation was triggered and Lovesac eventually filed a restatement of its financials for FY 2023 and Q1 2024. *Id.*

### B. Procedural History

On October 29, 2024, the SEC filed its Complaint. Compl.

On January 24, 2025, Ms. Dellomo filed a motion to dismiss with an accompanying memorandum in support and exhibits. Mot. to Dismiss, ECF No. 40 (Jan. 24, 2025); Memo. in Supp., ECF No. 40-1 (Jan. 24, 2025).

On the same day, Ms. Dellomo also filed a motion to strike. Mot. to Strike, ECF No. 41 (Jan. 24, 2025); Memo. in Supp., ECF No. 41-1 (Jan. 24, 2025) ("Dellomo MTS").

On the same day, Ms. Um also filed a motion to dismiss and, alternatively, strike certain relief. Mot. to Dismiss, ECF No. 42 (Jan. 24, 2025), Memo. in Supp., ECF No. 42-1 (Jan. 24, 2025) ("Um MTD").

On January 28, 2025, Ms. Dellomo filed an amended memorandum in support of her motion to dismiss. Am. Memo. in Supp., ECF No. 43 (Jan. 28, 2025) ("Dellomo MTD").

On February 27, 2025, the Court entered an Amended Consent Judgment in favor of the SEC against Lovesac. Am. Consent J., ECF No. 46 (Feb. 27, 2025).

On March 7, 2025, the SEC filed memorandums in opposition to the motions to strike and motions to dismiss. Memo. in Opp. to Mot. to Strike, ECF No. 47 (Mar. 7, 2025) ("Response re MTS"); Memo. in Opp. to Mot. to Dismiss, ECF No. 48 (Mar. 7, 2025) ("Response re MTD").

On April 3, 2025, Ms. Dellomo filed replies to the SEC's responses. Reply to Response to Mot. to Dismiss, ECF No. 51 (Apr. 3, 2025) ("Dellomo Reply re MTD"); Reply to Response to Mot. to Strike, ECF No. 52 (Apr. 3, 2025) ("Dellomo Reply re MTS").

On April 4, 2025, Ms. Um filed a reply to the SEC's responses. Reply to Response to Mot. to Dismiss and, Alternatively, to Strike, ECF No. 53 (Apr. 4, 2025) ("Um Reply").

On July 11, 2025, the SEC filed a notice of additional authority regarding a recent case in the Southern District of New York. Not. Of Ad. Authority, ECF No. 54 (July 11, 2025).

On July 15, 2025, Ms. Um filed a response to the SEC notice. Response re Not. Of Ad. Authority, ECF No. 55 (July 15, 2025).

On the same day. Ms. Um filed a notice of additional authority regarding a recent case in the D.C. Circuit. Not. Of Ad. Authority, ECF No. 56 (July 15, 2025).

## II.    STANDARD OF REVIEW

### A.  Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to

dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### B. Rule 12(f)

Under Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are generally "disfavored and granted only if there is strong reason to do so." *Holland v. Chase Bank United States, N.A.*, 475 F. Supp. 3d 272, 275 (S.D.N.Y. 2020) (citation omitted).

"'Immaterial' matter is that which has no essential or important relationship to the claim for relief, and 'impertinent' material consists of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 225 (E.D.N.Y. 2015) (citation omitted). "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Id.* (citation omitted).

"To prevail on a 12(f) motion, the moving party must demonstrate that: '(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant.'" *Id*. (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)). "Rule 12(f) authorizes the court to strike from the pleadings a request for relief if the allegations and claims asserted would not support that relief." *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 499 (S.D.N.Y. 2024) (quoting *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F.Supp.3d 322, 353 (S.D.N.Y. 2023)).

## III.  DISCUSSION

The SEC alleges several counts against Ms. Dellomo and Ms. Um (collectively, "Defendants") under various federal securities laws and regulations: Counts One (under sections 17(a)(1) and (3) of the Securities Act), Three (Section 10(b) of the Securities Act), Four (Section 10(b) of the Securities Act), Five (also under Section 10(b)), Six (Section 13(b)(5) of the Exchange Act), Seven (Section 13b2-1 of the Exchange Act), Eight (Section 13b2-2 of the Exchange Act), Ten (Section 13(a) of the Exchange Act), Eleven (Exchange Act Rule 13a-14), Thirteen (Section 13(b)(2)(a) of the Exchange Act), and Fifteen (Section 13(b)(2)(B) of the Exchange Act). *See* Compl.

Defendants move to dismiss each of the Counts against them. They also move to strike the portion of the Complaint requesting relief in the form of an order prohibiting Ms. Um and Ms. Dellomo from "acting in an accounting or financial reporting role at a public company in connection with the preparation of financial statements filed with the Commission, providing substantial assistance to a public company in the preparation of financial statements filed with the Commission, or acting as an auditor on a public company audit." Compl. at 30.

The Court will consider each motion in turn.

### A. The Motions to Dismiss

#### 1. The Fraud Claims: Counts One, Three, and Four

Rule 10b-5(b) of the Exchange Act prohibits the "mak[ing] of any untrue statement of a material fact or to omit to state a material fact" in a way that makes the statements "misleading." 17 C.F.R. § 240.10b-5(b). Liability under this Rule is limited to the "maker" of the statements. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("Under Rule 10b–5, it is unlawful for 'any person, directly or indirectly, ... [t]o make any untrue statement of a material fact' in connection with the purchase or sale of securities. To be liable, therefore, JCM must have 'made' the material misstatements in the prospectuses." (quoting 17 CFR § 240.10b–5(b)).); *SEC v. Rio Tinto plc*, 41 F.4th 47, 52 (2d Cir. 2022) ("For one, *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), limits primary liability under Rule 10b-5(b) to the 'maker' of the statement[.]"). The "maker of the statement is the person or entity with the ultimate authority over the statement." *Janus*, 564 U.S. at 142. "One who prepares or publishes a statement on behalf of another is not its maker." *Id.* The statement or omission must be "materially false." *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 197, 206 (2d Cir. 2009).

Sections 17(a)(1) and (3) of the Securities Act make it unlawful for "any person in the offer or sale of any securities . . . to employ any device, scheme, or artifice to defraud" or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1), (3). Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act similarly makes it unlawful for any person "in connection with the purchase or sale of any security," 15 U.S.C. § 78j(b), to "employ any device, scheme, or artifice

to defraud," or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit," 17 C.F.R. § 240.10b-5(a), (c).

"Together, Exchange Act § 10(b), Rule 10b-5(a) and (c), and Securities Act § 17(a)(1) and (3) 'create what courts have called "scheme liability" for those who, with scienter, engage in deceitful conduct.'" *SEC v. Sason*, 433 F. Supp. 3d, 508 (S.D.N.Y. 2020) (quoting *SEC v. Jean-Pierre*, No. 12 Civ. 8886 (LGS), 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)). In order to prove scheme liability, the SEC must demonstrate Scheme liability requires showing "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *SEC v. Collector's Coffee, Inc.*, 697 F. Supp. 3d 138, 157 (S.D.N.Y. 2023) (quoting *SEC v. Penn*, 225 F. Supp. 3d 225, 235 (S.D.N.Y. 2016)).

 Furthermore, under Rule 9(b) of the Federal Rules of Civil Procedure, "a party [alleging fraud] must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this rule, a plaintiff must allege "the time, place, speaker, and sometimes even the content of the alleged misrepresentations." *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986); *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996) (observing that when a complaint includes a claim of fraud, "it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent" (citations omitted)). "Where there are multiple defendants, Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud." *Alnwick v. European Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 639 (E.D.N.Y. 2003

The SEC asserts claims against Ms. Um and Ms. Dellomo under Exchange Act Section 10(b), Rule 10b-5(a), (b), and (c), and Securities Act Sections 17(a)(1) and (3) in Counts One, Three, and Four of the Complaint.

Ms. Dellomo argues that Lovesac failed to state a claim under Securities Act Section 17(a)(1) and (a)(3) for Count One because there are not allegations that she participated in the "offer or sale" of any securities. Dellomo MTD at 14. As to Counts One, Three, and Four, she argues that the SEC has failed to adequately allege "scheme liability," *id.* at 18, a material misrepresentation or omission, *id.* at 20, or scienter, *id.* at 27.

As to Counts One and Three, Ms. Um also argues that the SEC failed to allege scheme liability, Um MTD at 10, scienter, *id.* at 15, and materiality, *id.* at 25. She also argues that the SEC has failed to allege negligence for Section 17(a)(3) for Count One. *Id.* at 28.

The SEC argues that it adequately pled Ms. Dellomo's misstatements, Response to MTD at 3, that materiality was sufficiently alleged, *id.* at 5, that scienter was sufficiently alleged, *id.* at 14, that scienter is sufficient for Section 17(a)(3), *id.* at 19, and that a scheme has been sufficiently alleged, *id.* at 21. The SEC also argues that Ms. Dellomo's proposed definition of "offer or sale" is "restrictive and novel" and thus should be rejected. *Id.* at 25.

The Court will consider each argument in turn.

   a.   *Scheme Liability*

"Misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstates and omissions . . . ." *Rio Tinto*, 41 F.4th at 49 (citing *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 177 (2d Cir. 2005)); *see also SEC v. Wey*, 246 F. Supp. 3d 894, 925 (2d Cir. 2017) ("Claims for scheme liability require the SEC to plead deceptive conduct distinct from any alleged misrepresentations."). If a claim

alleging scheme liability is based solely on misstatements and omissions, "potential liability is foreclosed by *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). *SEC v. GPL Ventures LLC*, No. 21 Civ. 6814 (AKH), 2022 WL 158885, at *9 (S.D.N.Y. Jan. 18, 2022); *see also Rio Tinto*, 41 F.4th at 54 ("Were misstatements and omissions alone sufficient to constitute a scheme, the scheme subsections would swallow the misstatement subsections.").

Ms. Dellomo argues that the SEC cannot demonstrate scheme liability because there were no allegations "beyond the misrepresentations and omissions." Dellomo MTD at 18 (emphasis omitted). Ms. Um likewise argues that the "participation in the making of a false statement" alone cannot constitute scheme liability. Um MTD at 11–12.

In response, the SEC argues that the case is not only based on misstatements and omissions. Response to MTD at 21. Instead, Ms. Um and Ms. Dellomo allegedly "collud[ed] together to fraudulently cover up a serious accounting error to meet Lovesac's publicly announced financial metric, falsely certifying Lovesac's Q1 2024 Form 10-Q, and misleading Lovesac's outside auditor," which is sufficient to constitute a "scheme."

In reply, Ms. Um argues that the SEC is attempting to "improperly shoehorn[] its scheme liability into the Complaint," Um Reply at 5, and that its case is based on "acts and conduct [that] are far removed from recognized examples of the 'something extra' that could give rise to scheme liability," *id.* at 4.

The Court disagrees.

Here, Ms. Dellomo and Ms. Um are alleged to have both created an improper entry in Lovesac's general ledger to capitalize past shipping expenses. This could constitute a deceptive act beyond a misstatement or omission that could form the basis for scheme liability. *Cf. SEC v.*

*Cole*, No. 12-cv-8167, 2015 WL 5737275, at *8 (S.D.N.Y. Sept. 19, 2015) (finding that "backdating and fabricating work papers" was a deceptive act).

Accordingly, the SEC has sufficiently alleged a "deceptive act" for the purposes of scheme liability.

### b. The Scienter Requirement

To be compliant with Rule 9(b), "a complaint [is] required to allege facts giving rise to a 'strong inference' of fraudulent intent." *SEC v. Dunn*, 587 F. Supp. 2d 486, 499–500 (S.D.N.Y. 2008) (citing *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 558 (2d Cir. 1979) and *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). This can be done by showing "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *SEC v. Espuelas*, 698 F. Supp. 2d 415, 426 (S.D.N.Y. 2010) ("*Espuelas II*") (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

"Conclusory allegations do not support a strong inference of fraudulent intent." *SEC v. Espuelas*, 579 F. Supp. 2d 461, 474 (S.D.N.Y. 2008) ("*Espuelas I*"). And "[a]llegations that corporate officers took affirmative action to meet revenue, earning, or profit estimates contribute little to a strong inference because such actions are common practice." *Id.* Even "[a]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *ECA & Local 134 IBEW*, 553 F.3d at 200 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

Ms. Dellomo argues that the SEC has not demonstrated scienter because the complaint is based on only on a misapplication of accounting principles, does not demonstrate motive or

opportunity, and does not contain alleged facts leading to an inference of conscious misbehavior or recklessness. Dellomo MTD at 28–29.

Ms. Um likewise alleges that the SEC has not alleged a motive or opportunity, nor conscious wrongdoing or recklessness. Um MTD at 17–24. Um also alleges that the "lack of materiality strongly suffers an absence of scienter." *Id.* at 24.

In response, SEC argues that the allegations in the Complaint "constitute strong circumstantial evidence of conscious misbehavior or recklessness." Response re MTD at 15. Specifically, the SEC focuses on Ms. Dellomo's alleged "withhold[ing] information" from auditors by not informing them of the shipping expenses. *Id.* at 17. The SEC also points to alleged messages sent by Ms. Um stating that she did not know how to tell Ms. Dellomo she did not "feel comfortable" with the accounting of the shipping expenses. *Id.* The SEC concedes that it is not seeking to demonstrate scienter on the basis of motive and opportunity.

In reply, Ms. Dellomo argues that the SEC's basis for scienter as to her is at base an argument that she should have known better as an experience accounted and Chief Financial Officer of Lovesac, which is insufficient. Dellomo Reply re MTD at 8.

Ms. Um argues in reply that "[a]t bottom, the SEC merely alleges that Ms. Um should have handled this single corrective accounting entry differently," which is insufficient to demonstrate recklessness. Um Reply at 8.

The Court disagrees.

Several allegations weigh towards an inference of scienter for both Ms. Um and Ms. Dellomo. First, "the mere fact that the company had to make a large correction" to its past financial filings in the form of a restatement "is some evidence of scienter." *In re Atlas Air Worldwide Holdings, Inc. Securities Litigation*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).

Second, both Defendants are alleged to have not only significant experience as accountants, but also experience as auditors. *See* Compl. ¶ 11 ("Prior to serving as Lovesac's Controller, Um was a Controller at another public company for two years and spent almost a decade in various auditing roles at a large public accounting firm before that."); *id.* ¶ 14 ("Dellomo, an experienced financial professional and CPA, began her career as an auditor at various companies, and subsequently served as an accounting manager, corporate Controller, and CFO of another public company.").

And the Complaint alleges that improper capitalization violated GAAP for a straightforward reason—that capitalization should only be used for expenses with a future benefit, while the shipping expenditures were clearly for a past benefit. *Id.* The alleged accounting thus would have been obviously wrong, or at least should have been obviously wrong, to both Defendants. *See, e.g.*, *Espuelas I*, 579 F. Supp. 2d at 478 ("Even though Espuelas and Chen are not accounting professionals, a strong inference of recklessness might be drawn from allegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong."); *cf. SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1229 (S.D.N.Y. 1992) (finding that accounting that was "clearly an area in which reasonable accountants can differ" was insufficient to show recklessness). Together, these allegations suggest an inference of fraudulent intent for both Defendants. *See, e.g.*, *Espuelas I*, 579 F. Supp. 2d at 474 ("It would likely be sufficient for a strong inference of recklessness if a complaint added the allegation that defendants had a high level of accounting expertise to allegations of GAAP violations and a large restatement.").

Furthermore, as to Ms. Um, SEC provides at least some allegations suggesting conscious wrongdoing. *See, e.g.*, Compl. ¶ 33 ("Um replied: 'I just don't know how I can support [it].'"); *id.*

¶ 38 ("With respect to the journal entry, Um stated in a Microsoft Teams chat: "I don't know how to tell [Dellomo] I don't feel comfortable with it[.]"). That Ms. Um allegedly had some awareness that the accounting was improper and still went forward is additional evidence of at least recklessness. *See Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) ("[R]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (quoting *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47 (2d Cir. 1978)).

And, as to Ms. Dellomo, she allegedly certified at least some statements that she knew were false.[2] For example, she stated represented in the management representation letter to the auditor that "We believe all expenditures that have been deferred to future periods are recoverable." *Id*. ¶ 49. Contrary to this representation, Ms. Dellomo allegedly knew that the past shipping expenses deferred to the future quarters of 2024 were not recoverable, further suggesting recklessness. *See, e.g., Novak*, 216 F.3d at 308 ("According to these cases, securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their

---

[2] The SEC also argues that Ms. Dellomo misrepresented to auditors that the accounting was consistent with GAAP and that "there was no reason to mislead the auditors [with statements like this] if Dellomo believed that capitalizing the last mile shipping expenses was appropriate and consistent with GAAP." Response re MTD at 16–17. This argument, however, is unavailing. It is likewise true that there would be "no reason" for Ms. Dellomo to tell the auditors that the accounting was consistent with GAAP if she actually believed that the accounting was consistent with GAAP. In other words, the allegations that Ms. Dellomo certified in public filings and to auditors that the accounting was consistent with GAAP is not alone suggestive of recklessness or fraudulent intent; it could just as well suggest that Ms. Dellomo lacked intent to commit fraud and genuinely believed that the accounting was proper. As explained above, the key allegations pointing to scienter are those that suggest Ms. Dellomo should have known, or actually knew, that the accounting was fraudulent. *See Novak*, 216 F.3d at 308 ("Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.").

public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.").

Accordingly, the SEC has sufficiently alleged scienter at this stage.[3]

### c.  Materiality

"Whether a misstatement is material 'depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.'" *Plumber and Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 100 (2d Cir. 2021) (quoting *ECA & Local 134 IBEW*, 553 F.3d at 206). To be material, the omitted or misstated fact must "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). "Because materiality involves a 'fact specific inquiry,' it can be decided on a motion to dismiss only if 'reasonable minds cannot differ on the question of materiality." *Dankse Bank*, 11 F.4th at 101 (citations omitted) (first quoting *Basic*, 485 U.S. at 240, then quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

Ms. Dellomo argues that the SEC has not demonstrated materiality because it does not show how the alleged accounting error impacted its overall financial picture. Dellomo MTD at 23. Specifically, Ms. Dellomo argues that the Complaint "says nothing about how the accounting error impacted Lovesac's net sales, gross profit, operating income, or net income when compared to the restated figures." *Id.* at 23; *see also id.* at 26 ("Nor did the complaint allege that it affected a significant aspect of Lovesac's operations—because it did not.").

---

[3] Since the higher scienter standard been met, the SEC need not plead negligence as well. *See SEC v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017) ("However, because the Court finds that the SEC has properly plead the higher standard of scienter in connection with its misrepresentation claim, Uchimoto's motion to dismiss the Section 17(a)(2) claim for a failure to plead negligence is denied.").

Ms. Um argues that "[t]he Complaint is noticeably conclusory in alleging materiality." Um MTD at 25. Ms. Um also argues that the eventual restatement of Lovesac's accounting alone is insufficient to demonstrate materiality. *Id.* at 26.

In response, the SEC argues that the misstatements and omissions are material because a reasonable investor "would certainly want to know that the Company's senior management was manipulating financial results." Response re MTD at 8. The SEC also argues that the issue was apparently material to Ms. Um and Ms. Dellomo because they sought to "cover it up," sent e-emails on the weekend, and caused them to "go off the GAAP rails." *Id.* at 8–9. Finally, the SEC argues that the financial forms were "full of omissions" and asks "what reasonable investor would not want to know that Lovesac's senior finance personnel certified financial statements that were rife with omissions?" *Id.* at 9.

In reply, Ms. Dellomo argues that the alleged amortization of the shipping expenses had "no material impact on Lovesac's total financial condition." Dellomo Reply re MTD at 4. Ms. Dellomo also argues that the "SEC's Complaint lacks the necessary connective tissue needed to sufficiently explain why a reasonable investor would believe that a $2.2 million timing error for a company with over $650 million in sales revenue '*significantly altered* the total mix of information available'" *Id.* (quoting *Basic*, 485 U.S. at 231–32) (emphasis in original).

Ms. Um argues in reply that the SEC "makes a confused and circular argument that the accounting correction must have been material because Defendants 'certainly thought' it was material." Um Reply at 11 (quoting Response re MTD at 8). Ms. Um also reiterates that to the extent the SEC's argument is based on the restatement, it is insufficient, and that the SEC has not alleged any effect on the investors or the market. *Id.* at 12–13.

The Court disagrees.

19

At this stage, "a complaint may not be properly dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

Here, although the SEC's factual allegations lack information on the full financial picture of Lovesac, they are sufficient at this time. The Complaint alleges that gross margin with the shipping expenses properly accounted for would have been around 48.7% compared to the projected 50.1%. *See* Compl. ¶ 30. A reasonable investor could be influenced by a lowered gross margin, especially considering that the true gross margin would not have hit the company's projections. *See Ganino*, 228 F.3d at 163 ("With respect to financial statements, the SEC has commented that various qualitative factors may cause misstatements of quantitatively small amounts to be material. Of particular relevance to this action are the following: . . . whether the misstatement masks a change in earnings or other trends [and] whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise." (internal citations and quotation marks omitted)).

Additionally, Lovesac allegedly had to restate its filings to the SEC in light of the alleged fraud. *See id.* ¶ 3. The filing of a restatement correcting the misstatements further supports the allegation that they were material.[4] *See, e.g.*, *SEC v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y.

---

[4] Ms. Dellomo argues that the particular misstatements and omissions regarding the last mile shipping expenses were not determined to be material and that the restatement was only warranted when this error "was aggregated" with other ones. Dellomo MTD at 23. At this stage, however, the Court must accept the factual allegations in the Complaint as true and avoid looking to outside evidence. *See McCarthy*, 482 F.3d. at 191 ("In general, our review is limited to the facts as asserted within the four corners of the complaint[.]") To the extent Defendants have evidence that the restatement did not consider the misstatements at issue to be material, this is better addressed at the summary judgment stage.

2009) ("Additionally, under Generally Accepted Accounting Principles [], a restatement issues only when errors are material. Thus, the fact that AOL restated its revenues to correct for the improper recognition of certain advertising revenues in connection with the transactions detailed in the complaint belies any suggestion that any misstatement or omission was not material.")

Accordingly, the SEC's allegations are sufficient to suggest materiality of the misstatements at this time.

### d.  "Offer or Sale"

In *United States v. Naftalin*, the Supreme Court made clear that Congress intended the words "in the offer or sale" to be "define[d] broadly," and that they are "expansive enough to encompass the entire selling process." 441 U.S. 768, 773 (1979). Following this guidance, district courts in this Circuit have determined that the "offer or sale" requirement is met when the fraud has a nexus to the company's publicly traded stocks. *See, e.g.*, *SEC v. Farnsworth*, 692 F. Supp. 3d 157, 188 (S.D.N.Y. 2023) ("The SEC has adequately pleaded that the misstatements occurred with the requisite nexus to the sale of securities because HMNY's stock was publicly traded on the NASDAQ during the relevant period. . . . The Complaint here alleges facts supporting an inference that Farnsworth and Lowe were aware that the sales of HMNY stock on the secondary market would be ongoing and still made the statements, and thus continued to be part of the 'selling process.' . . . "[T]he SEC has adequately pleaded the nexus element of its Section 17(a) claims."); *SEC v. Mudd*, 885 F. Supp. 2d 654, 670 (S.D.N.Y. 2012) ("The complaint here alleges that FNMA's common stock was traded on the New York Stock Exchange ("NYSE") during the Relevant Period. . . . This is sufficient to find that the SEC has adequately stated a claim against Mudd and Dallavecchia under Section 17(a)(2)."); *cf. SEC v. Wyly*, 117 F. Supp. 3d 381, 381 (S.D.N.Y. 2015) ("Even assuming, *arguendo*, that the language

of section 17(a) does not sweep as broadly as that of section 10(b), the misrepresentations contained in the Wylys' post-transaction filings are 'in the offer or sale' of securities, because the market in which they were selling these securities was misled about the extent of the Wylys' holdings and the frequency of their trading.").

Ms. Dellomo argues that the text of Section 17(a) suggests that it is "more limited in its reach than Rule 10b-5" because the fraud must occur "in the offer or sale" of a security rather than "in connection with the purchase or sale" of a security. Dellomo MTD at 16. She argues that given this specific language, "the mere fact that Lovesac's shares were publicly traded during the relevant period is insufficient to satisfy the 'offer or sale' element" in Count One. *Id.* at 18.

In response, the SEC argues that the offer and sale language is "defined 'broadly'" under Supreme Court precedent, and that other courts in this Circuit have determined that publicly traded stock in the period of the of the misstatements is sufficient for the "offer or sale" requirement. Response to MTD at 24–25.

The Court agrees.

Here, the SEC alleges that Ms. Dellomo approved an inaccurate accounting journal entry which had the effect of erroneously boosting Lovesac's gross margin to bring it in-line with projections. As the projected and actual gross margins were publicly disclosed in filings and an earnings call, the allegedly inaccurate gross margin could have an impact on the offer and sale of the company's stocks. The SEC has thus adequately alleged that Ms. Dellomo's actions occurred "in the offer or sale" of securities.

Accordingly, the motions to dismiss will be denied as to Counts One, Three, and Four.

### 2. The Books and Records Claims: Counts Six, Seven, Eight, and Eleven

Under Section 13(b)(5) of the Exchange Act, "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" of any issuer required to file reports. 15 U.S.C. § 78m(b)(5). Rule 13b2–1 implements § 13(b)(5) and requires that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2–1 (2013). "Section 13(b)(5) requires plaintiffs to plead that an individual acted with knowledge . . . ." *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 393 (S.D.N.Y. 2014). Rule 13b2-1, however, has "no scienter requirement; liability is predicated on 'standards of reasonableness.'" *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 866 (S.D.N.Y. 1997) (quoting Promotion of Reliability of Financial Information, Exchange Act Release No. 34,15570).

Under Rule 13b2-2 of the Exchange Act, "[n]o director or officer . . . shall . . . [o]mit to state or cause another person to omit or state, any material fact." 17 C.F.R. § 240.13b2-2. Rule 13a-14 of the Exchange Act requires that financial reports filed with the SEC must include a certification of accuracy by a principal executive or financial officer of the organization. *See* 17 C.F.R. § 240.13a-14.

The SEC alleges that Ms. Um and Ms. Dellomo violated Section 13(b)(5) and Rule 13b2-1 by falsifying Lovesac's books and records. The SEC also alleges that Ms. Dellomo improperly certified Lovesac's forms and improperly influenced an account to omit or misstate material facts.

Ms. Dellomo argues that these claims "suffer from the same fatal flaws" as the fraud claims because the SEC has not sufficiently alleged that she acted "knowingly" or that the

omissions and misstatements were material. Dellomo MTD at 32. She also argues that her actions were "reasonable" and therefore she could not have violated Rule 13b2-1 or Rule 13b2-2. *Id.* at 33–34. Ms. Dellomo also argues that the Second Circuit has not decided whether Rule 13a-14 can be plead as a claim, and some other courts have determined that it cannot. *Id.* at 36.

Ms. Um argues that the SEC has "exceeded its authority by extending Rule 13b2-1 to individuals" as Section 13(a) applies only to "issuers' of securities. Um MTD at 32. Ms. Um also argues that the Court should apply a scienter requirement to Rule 13b2-1. *Id.* at 35. Finally, Ms. Um argues that her actions were not "unreasonable." *Id.* at 36.

In response, the SEC argues that courts in this circuit have "routinely" allowed Rule 13a-14 claims to proceed, Response re MTD at 30, and that the Rule 13b2-1 and Rule 13b2-2 properly apply to "individuals" and are within the SEC's statutory authority, *id.* at 28.

In reply, Ms. Um reiterates that her conduct was not unreasonable. Um Reply at 18. She also argues again that the SEC has extended its statutory authority in promulgating Rule 13b2-1 in light of *Loper v. Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).

The Court disagrees.

First, as well as setting requirements for "issuers" of securities, Section 13(b)(5) explicitly limits what a "person" can do. *See* 15 U.S.C. § 78m(b)(5) ("No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)."). Thus, in the Court's "independent judgement," the SEC "acted within its statutory authority," *Loper Bright*, 603 U.S. at 412, when promulgating Rules 13b2-1 and 13b2-2 under Section 13 of the Exchange Act.

Second, as explained above, the SEC has alleged scienter sufficient to survive a motion to dismiss. Therefore, they have sufficiently alleged that the accounting treatment was "unreasonable" for the purposes of Rules 13b2-1 and 13b2-2 have a reasonableness requirement. And, assuming *arguendo*, that there is a scienter requirement for these rules as Defendants argue, such a requirement has been met.

As for Section 13(b)(5), the knowledge requirement can be met by showing that the Defendants "knew of facts that contradicted the substance of the reported accounting." *China Northeast Petroleum Holding Ltd.*, 27 F. Supp. 3d at 394 (quoting *SEC v. Espuelas*, 767 F. Supp. 2d 467, 476 (S.D.N.Y. 2011) ("*Espuelas III*")). Here, the SEC has alleged that Ms. Dellomo capitalized the past shipping expenses, an accounting treatment for "expenditures that provide future economic benefits." Compl. ¶ 21. Accepting the allegations in the Complaint as true, Ms. Dellomo would have been aware that the past shipping expenses would not provide future economic benefits, and thus she would have been aware that this accounting treatment was improper and that any reports certifying this accounting treatment were misstated. Thus, the SEC has alleged a "knowing" violation. *See, e.g.*, *China Northeast Petroleum Holding Ltd.*, 27 F. Supp. 3d at 394 ("As the undisputed central figure of the Company and, according to the Complaint, the personal recipient of millions of dollars in offering proceeds, Wang would certainly have known that the CNEP accounting reports omitted essential details about the allocation of corporate funds; his lack of accounting training or expertise is no bar to liability. Therefore, we find that the SEC has adequately pled Wang's books and records liability, and Counts Three and Four may proceed." (internal citations omitted)).

Finally, while the Second Circuit has not decided the issue, the Court joins the numerous district courts in this Circuit in allowing the SEC to bring a claim under Section 13a-14. *See, e.g.*,

*SEC v. Egan*, 994 F. Supp. 2d 558,  568 (S.D.N.Y. 2014) (allowing claim to proceed under Rule 13a–14); *SEC v. Tuzman*, No. 15-cv-7057, 2017 WL 11606728, at *17 (S.D.N.Y. Sept. 29, 2017) (same); *SEC v. Takeyasu*, No. 1:17-cv-4866 (GHW) 2018 WL 2849777, at *21 (S.D.N.Y. June 11, 2018) (same); *SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 290 (E.D.N.Y. 2020) (same); *SEC v. Saltsman*, No. 07-cv-4370 (NGG), 2016 WL 4136829, at *22 (E.D.N.Y. Aug. 2, 2016) (same); *see also SEC v. Escala Grp., Inc.*, No. 09 Civ. 2646 (DLC), 2009 WL 2365548, at *15 (S.D.N.Y. July 31, 2009) ("In the instant motion papers, the parties debate the issue of whether a violation of Exchange Act Rule 13a–14 can be pled as an independent claim. Because resolution of this issue will not impact the course of discovery in this litigation, this issue will not be addressed at this time. The defendants' motions to dismiss this claim are therefore denied without prejudice to renewal at an appropriate time.").

Accordingly, the motion to dismiss will be denied as to Counts Six, Seven, Eight, and Eleven.

### 3.  The Aiding and Abetting Claims: Counts Five, Ten, Thirteen, and Fifteen

"In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.'" *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir.2009)).

The SEC alleges Ms. Um aided and abetted Ms. Dellomo in securities fraud, and that Ms. Um and Ms. Dellomo aided and abetted Lovesac in various books and records claims.

Ms. Dellomo argues that the SEC has not demonstrated she aided nor abetted any of these alleged violation for many of the reasons already stated. She also argues that there are no factual allegations about any alleged role in Lovesac's internal system of accounting. Dellomo MTD at 32.

Ms. Um argues that Count Five must fail because the SEC has failed to allege a primary violation and has failed to allege scienter. Um MTD at 31. She also argues that Count Thirteen must fail for the reasons previously discussed. *Id.* at 32.

The SEC argues that it sufficiently pled primary violations and facts to demonstrate that Ms. Um and Ms. Dellomo aided and abetted Lovesac. Reply re MTD at 33–34.

The Court agrees in part and disagrees in part.

As discussed in detail above, the SEC has sufficiently alleged that Ms. Um and Ms. Dellomo acted with scienter to apply the improper accounting to the shipping expenses, causing later filings and representations to be materially misstated. This is sufficient for the aiding and abetting claims as to Counts Five, Ten, and Thirteen.

Count Fifteen alleges, however, that Ms. Dellomo aided and abetted Lovesac in "failing to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that its financial statements are prepared in conformity with GAPP." Compl. ¶ . The SEC fails to allege facts related to Ms. Dellomo's control over any accounting systems, or the sufficiency of the accounting system as whole. Specifically, the allegations of the singular accounting problem at the center of the Complaint are insufficient to show that Lovesac's accounting system and controls were inadequate. *See, e.g.*, *North Collier Fire Control & Rescue District Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034, 2016 WL 5794774, at *16 (S.D.N.Y. Sept. 30, 2016) ("First, the mere fact that MDC's internal controls failed to

27

catch these improper reimbursements does not demonstrate the falsity of MDC's statements that its controls were adequate."). Indeed, the Complaint itself alleges that this incident was somewhat of an aberration and the "normal practice" at Lovesac was to have "detailed accounting support prior to approval" of accounting journal entries. Compl. ¶ 40.

And, while the Complaint states that "Dellomo failed to implement sufficient internal controls over financial reporting," *id.* ¶ 3 and "Lovesac's monthly accrual methodology [for shipping expenses] was flawed," *id.* ¶ 27, such unexplained and conclusory allegations are inadequate to state a claim for relief. *See, e.g.*, *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *SEC v. Siebel Systems, Inc.*, 384 F. Supp. 2d 694, 710 (S.D.N.Y. 2005) ("The complaint is bereft of any particular factual allegations demonstrating that Siebel Systems did not have sufficient controls and procedures in place to enable the company to fully comply with Regulation FD. The statements relied upon by the SEC in its complaint do not support an allegation of nonpublic material disclosure. The complaint contains only conclusory assertions that Siebel Systems failed to maintain controls and other procedures designed to ensure that nonpublic material information is publicly disclosed within the required time period specified in the SEC's rules and forms.").

Accordingly, the motion to dismiss will be denied as to Counts Counts Five, Ten, and Thirteen, and granted as to Count Fifteen.

### B. The Motions to Strike

Under the Exchange Act, when a person is "engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, . . . [the SEC] may in its

discretion bring an action in the proper district court of the United States . . ., to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 78u(d)(1). An injunction should only be issued under this provision when "the defendant's past conduct indicates that there is a reasonable likelihood of future violations." *SEC v. Commonwealth Chemical Securities*, 574 F.2d 90, 99 (2d Cir. 1978) (internal citation and quotation marks omitted). Generally, the SEC must "go beyond the mere facts of past violations and demonstrate a realist likelihood of recurrence." *Id.* at 100; *see also SEC v. Culpepper*, 270 F.2d 241, 250 (2d Cir. 1959) ("The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.").

When considering whether an injunction is appropriate, courts consider "the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *Commonwealth Chemical Securities*, 574 F.2d at 100 (quoting *SEC v. Commonwealth Chemical Securities, Inc.*, 410 F. Supp. 1002, 1020 (S.D.N.Y. 1976)).

At the pleading stage, "where . . . the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for relief . . ., since determining the likelihood of future violations is almost always a fact-specific inquiry." *SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011). This is because "fraudulent past conduct" can "give[] rise to an inference of a reasonable expectation of continued violations." *Id.* (quoting *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975)). "Whether th[is]

inference . . . is properly drawn, however, depends on the totality of the circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *Management Dynamics, Inc.*, 515 F.2d at 807.

As relief for its claims, the SEC requests that the Court enter an injunction permanently banning Ms. Um and Ms. Dellomo from "acting in an accounting or financial reporting role" for the remainder of their lives. Compl. at 30. The SEC also requests an injunction banning Ms. Um and Ms. Dellomo from acting as an officer or director of any company that issues securities. *Id.* at 29.

Ms. Dellomo moves to strike the requested lifetime ban on accounting from the Complaint, arguing that the injunction sought is "unlike any historically grounded equitable remedy." Dellomo MTS at 8. Ms. Dellomo also argues that the requested relief is not "appropriate or necessary for the benefit of investors," as required by statute. *Id.* at 10 (quoting 15 U.S.C. § 78(u)(d)(5)).

Ms. Um requests that both the accounting ban and the director and officer ban be stricken, arguing that they are effectively punishment and there is no showing that the bars are needed to "prevent future harm." Um MTD at 39–40.

The SEC argues that the motions to strike are premature due to the "fact-sensitive" nature of injunctions. Response re MTS at 2. The SEC also argues that the Court has the authority to impose the injunctions it requests, and provides examples of other injunctions issued in the Second Circuit. *Id.* at 4–7.

In reply, Ms. Dellomo argues that the cases cited by the SEC are not "comparable to the facts alleged in the complaint because, in both cases, the remedy was designed to protect the investing public, and was therefore imposed 'for the benefit of investors,' as the enabling statute

requires." Dellomo Reply re MTS at 3. Ms. Um likewise argues that the requested injunction at issue here is "far more draconian than the remedies in the SEC's other cited authorities." Um Reply at 20. Ms. Um also notes that "no court has ever imposed the specific equitable bar that the SEC seeks here." *Id.* at 19.

The Court agrees in part and disagrees in part.

The SEC seeks a ban referred to as the "securities industry equivalent of capital punishment." *SEC v. Gentile*, 939 F.3d 549, 566 (3d Cir. 2019). The "loss of livelihood and stigma attached to a permanent exclusion" are significant, and recognizing the severity, the Second Circuit has admonished that district courts consider "whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient" before the imposition of a lifetime ban." *SEC v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995).

Indeed, in the rare circumstances where a lifetime ban is appropriate, the conduct has been severe, and the risk of continued behavior high. For example, the Second Circuit recently affirmed a lifetime ban from pharmaceutical practice in *Federal Trade Commission v. Shkreli*, where the defendant's "illegal scheme was 'egregious, deliberate, repetitive, long-running, and ultimately dangerous.'" No. 22-728, 2024 WL 1026010, at *2 (2d Cir. Jan. 23, 2024). The scheme at issue in that case was "comprehensive" and "far-reaching," and ultimately led to the cost of a "life saving drug, Daraprim," being raised from $17.50 to $750 per tablet. *Id.*

Furthermore, that defendant expressed no remorse and testified that he hoped to continue "playing a role" in the development of medications after release from prison. *Id.; see also FTC v. Shkreli*, 581 F.Supp.3d 579, 639–40 (S.D.N.Y. 2022) ("The Daraprim scheme was particularly heartless and coercive. Daraprim must be administered within hours to those suffering from

active toxoplasma encephalitis. . . .  Moreover, in the face of public opprobrium, Shkreli doubled

down. He refused to change course and proclaimed that he should have raised Daraprim's price

higher. . . . Shkreli's anticompetitive conduct at the expense of the public health was flagrant and

reckless. He is unrepentant. Barring him from the opportunity to repeat that conduct is nothing if

not in the interest of justice.").

    The facts alleged here, while allegedly unlawful and harmful, do not rise to the same

level. Notably, there are no allegations that Ms. Um or Ms. Dellomo engaged in a pattern of

behavior or had a history of violations. Instead, the Complaint largely centers on a single

incident: one journal entry in Lovesac's accounting book. While there are open questions of fact

as to the scienter of the Defendants, even assuming *arguendo* that they acted with a high level of

scienter, it seems unlikely that a lifetime ban would be warranted. *See, e.g.*, *SEC v. Jones*, 476 F.

Supp. 2d 374, 383–84 (S.D.N.Y. 2007) (finding that injunction was a "punishment" and thus

barred by the statute of limitations when the SEC offered "no positive proof aside from

Defendants' past wrongdoing to suggest 'some cognizable danger of recurrent violation'" and

there was a high "severity of the[] collateral consequences" imposed by the injunction (quoting

*Culpepper*, 270 F.2d at 250)).

    Moreover, the SEC cites to cases that demonstrate the existence of allegedly similar

injunctions featuring less stringent bans and more flagrant, or at least repeated, violations. *See,*

*e.g.*, *SEC v. CKB168 Holdings, Ltd.*, No. 13-civ-5584, 2022 WL 3347253, at *3 (E.D.N.Y. Aug.

12, 2022) ("Third, this was not an isolated incident. The Court found Defendants regularly

engaged in and/or promoted this fraudulent scheme over a period of two years. . . . Finally, the

Court finds that there is a significant likelihood of future violations. Shern, Leung, Lin, and Guo

have a history of being involved in other MLM schemes, and so it is reasonable to conclude that

barring an injunction they could do so again."); *SEC v. Bronson*, 246 F. Supp. 3d 956, 974 (S.D.N.Y. 2017) (finding penny stock bar and violation-specific injunction appropriate where "[d]efendants' violations of § 5 were not isolated, but continuous and systematic over a period of more than three years"); *SEC v. Abarbanel*, No. 21-cv-5429 (AS), 2025 WL 1903792, at *1 n.1 (S.D.N.Y. July 10, 2025) (denying motion to strike injunction when defendant was criminally charged based on the same extensive, multi-year scheme); *SEC v. SeeThruEquity, LLC*, No. 18 civ. 10374 (LLS), 2022 WL 171196, at *3 (S.D.N.Y. Jan. 19, 2022) (granting injunction where the "misconduct was repeated over several years, far from an isolated occurrence" and the "nature of the fraudulent misconduct involved precisely the type of conduct sought to be enjoined").

Nevertheless, given the fact-intensive nature of the imposition of injunctions, particularly around the Defendants' scienter and remorse, the Court will not strike the requested relief from the Complaint at this time. *See, e.g.*, *Gabelli*, 653 F.3d at 61 ("We first observe that where, as here, the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry. Indeed, the defendants are unable to point to a single case where the SEC's prayer for injunctions against further violations was dismissed at the motion to dismiss stage based upon a finding of non-likelihood of further violations."); *but see id.* (noting that "[i]n any event" the conduct alleged lasted "for almost three years"). After the close of discovery, the Defendants may renew their arguments regarding the requested relief in the form of a motion to strike or other appropriate motion.

Accordingly, the motions to strike will be denied, without prejudice to renewal.

**IV.    CONCLUSION**

For the foregoing reasons, Ms. Dellomo's motion to dismiss is **GRANTED in part** and

**DENIED in part** and Ms. Um's motion to dismiss is **DENIED**. Count Fifteen will be dismissed,

and all other Counts remain.

The motions to strike are **DENIED**, without prejudice to renewal.

To the extent deficiencies identified in this Ruling and Order can be remedied, the SEC

may file a motion for leave to amend the Complaint by **September 19, 2025**.

**SO ORDERED** at New Haven, Connecticut, this 15th day of August, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE